(No. 47976, 48078 cons.—

THE CITY OF JOLIET, Appellee, v. KENT BOSWORTH, County Treasurer, Appellant.—THE VILLAGE OF BARTONVILLE *et al.*, Appellees, v. EDWARD T. O'CONNOR, County Treasurer, Appellant.

*Opinion filed Oct. 1, 1976.—Rehearing denied Nov. 12, 1976.*

517

Martin Rudman, State's Attorney, of Joliet (Nicholas E. Sakellariou, Assistant State's Attorney, of counsel), for appellant.

Raymond A. Feeley, Corporation Counsel, of Joliet, for appellee.

Frank M. Pfeifer and Thomas W. Kelty, of Springfield, for *amicus curiae* Illinois Municipal League.

Michael M. Mihm, State's Attorney, of Peoria (Lyle W. Allen, Special Assistant State's Attorney, and Michael M. Mihm and Lyle W. Allen, of counsel), for appellant.

David J. Walvoord and Thomas E. Leiter, both of Peoria (Kavanagh, Scully, Sudow, White & Frederick, and Leiter, Newlin, Fraser, Parkhurst & McCord, of counsel), for appellees.

Paul E. Hamer, of Northbrook, for *amicus curiae* Wheeling Trust and Savings Bank.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

These consolidated appeals involve the question of the constitutionality of section 21a of "An Act concerning fees and salaries, and to classify the several counties of this state with reference thereto" which provides that counties may bill each taxing district within the county for its proportionate share of the actual costs incurred by the county in extending and collecting taxes on behalf of all taxing districts. (Ill. Rev. Stat., 1974 Supp., ch. 53, par. 39a.) Suits for declaratory judgment challenging the validity of the statute were instituted in the circuit courts of Will and Peoria counties by certain taxing districts within those counties against the respective county treas-

urer in his capacity as *ex officio* county collector. In each case, judgment was entered by the trial court holding the statute to be in violation of section 9(a) of article VII of the 1970 Constitution of Illinois. Direct appeals to this court have been taken by the defendant county treasurers pursuant to Supreme Court Rule 302(a).

The statute in question, which became effective October 1, 1974, provides:

> "Each county collector, when authorized by an ordinance passed by the county board, shall determine the total actual costs to the county of extending and collecting taxes on behalf of taxing districts within the county and charge each taxing district its proportionate share of those costs. The proportionate share of a taxing district shall be determined by applying the same percentage to the actual total cost of extension (as determined by cost analysis by an independent auditing firm) as its extension (dollar amount) bears to the total extension (dollar amount). The resultant amount shall be billed to each taxing district after tax collections have been distributed to all taxing districts within the county. For purposes of this section, 'taxing district' includes the county." Ill. Rev. Stat., 1974 Supp., ch. 53, par. 39a.

Pursuant to the foregoing statute, the Will County Board adopted the following resolution on May 21, 1975:

> "RESOLUTION
>
> RE: Implementation of 1% Charge
>
> WHEREAS, in 1974 this County Board did adopt an Ordinance implementing House Bill 194 which authorized the County to recover its actual cost of extending and collecting taxes on behalf of all taxing districts, and
>
> WHEREAS, an accounting firm was hired, in accordance with Section 4 of this Ordinance to provide the County with the cost analysis required by the legislation, and
>
> WHEREAS, the report of the auditing firm has been submitted to the County Board and the cost of extending and collecting of tax bills, in accordance with House Bill 194 is determined to be $708,610.00, which places the cost at approximately 1% of the 1973 Levy.
>
> NOW, THEREFORE, BE IT RESOLVED (1) that the

County Board approves the recommendation of Werner, Rogers and Maher placing the cost of extending and collecting taxes in Will County at 1% of the total monies collected and (2) that the County Board hereby adopts, from this date, that rate and orders the Treasurer to bill the taxing bodies their pro rated share."

In accordance with the resolution, the treasurer of Will County billed the City of Joliet for $37,031.96 and the City of Joliet Road and Bridge District for $1,516.43 as each taxing district's proportionate share of the cost to Will County of the extension and collection of taxes in 1974.

Cause No. 47976 originated with the filing of a complaint for declaratory judgment and other relief by the City of Joliet against Kent Bosworth, treasurer of Will County, alleging *inter alia* that the statute and the ordinance enacted pursuant thereto violated section 9(a) of article VII of the 1970 Constitution of Illinois, which provides:

"Compensation of officers and employees and the office expenses of units of local government shall not be paid from fees collected. Fees may be collected as provided by law and by ordinance and shall be deposited upon receipt with the treasurer of the unit. Fees shall not be based upon funds disbursed or collected, nor upon the levy or extension of taxes."

It was alleged that the county was attempting to collect "the office expenses of a unit of local government" as well as a fee "based upon funds disbursed or collected" and upon the "levy or extension of taxes" contrary to the provisions of section 9(a). The complaint further alleged that citizens of the City of Joliet had been denied equal protection of the law and that implementation of the statute and the resolution violated the due process clauses of the Federal and State constitutions. At the conclusion of a hearing, the trial court entered an order declaring the statute and resolution invalid under the State and Federal constitutions, enjoining the defendant county treasurer

from collecting any charges or bills for the costs of collecting taxes pursuant to the statute and resolution, and directing that the defendant return to various taxing bodies all monies which had already been collected for such purposes.

Cause No. 48078 is concerned with a similar implementing resolution adopted October 8, 1974, by the Peoria County Board which resulted in the county treasurer of Peoria County submitting bills to the various taxing districts in the county for their proportionate share of the total cost of extending and collecting 1973 taxes, including a bill to the Village of Bartonville for $1,015 and a bill to the Board of Education, City of Peoria, School District No. 150 for $167,670.

The Village and School District filed a complaint for declaratory judgment and injunctive relief in the circuit court of Peoria County against Edward T. O'Connor as treasurer and *ex officio* collector of the County of Peoria alleging in count I that the statute and ordinance violated that portion of section 9(a) of article VII of the 1970 Constitution providing: "Fees shall not be based upon funds disbursed or collected, nor upon the levy or extension of taxes." A second count alleged the invalidity of the resolution in that it attempted to apply the statute retroactively to 1973 taxes collected prior to the passage of the resolution and prior to the effective date of the statute. After a hearing, the trial court found in favor of plaintiffs as to count I and entered an order declaring the statute and ordinance to be unconstitutional under the 1970 Constitution of Illinois, restraining future collection of costs or fees, and directing the return of all amounts theretofore collected by defendant under the ordinance and statute.

The defendant county treasurers argue on this appeal that section 21a of "An Act concerning fees and salaries ***" conforms with section 9(a) of article VII of the 1970 Constitution in that it eliminates the objectionable "skim-

ming off" by the county collector of an arbitrary percentage which bore no relationship to the actual cost of billing and collecting taxes. They argue further that the charge to the taxing districts under section 21a is not "based upon levy or extension of taxes" as proscribed by the Constitution since it is based on the actual cost to the county of providing tax collection services to the local taxing bodies. It is also urged that when the framers of the Constitution used the word "fee" in section 9(a) of article VII they were thinking of a fixed charge rather than a charge based on actual cost.

Resolution of these questions requires reference to prior tax collection practices and the proceedings of the constitutional convention which drafted section 9(a). Prior to 1870, it was the practice in this State to give some local officials no salary but instead to permit them to keep the fees they collected from the public. This so-called "fee office" system was reformed to some degree under the 1870 Constitution, which required that specified officials be compensated for their services by salary and that compensation of all county officials, including the necessary expenses of running the office, were to be established by the county boards of each county. (Ill. Const. 1870, art. X, secs. 9, 10.) Fees continued to be the source for payment of such compensation, but the Constitution provided that all fees in excess of such compensation were to be paid into the county treasury. A number of inequities arose under this system, particularly with regard to fees charged for the collection of taxes by county and township collectors. At the time of adoption of the 1970 Constitution, county collectors were authorized to deduct a fee equal to 3% of the taxes collected on behalf of various taxing bodies within the county (Ill. Rev. Stat. 1969, ch. 53, par. 39), and township collectors had been allowed to deduct a 2% commission from all moneys so collected (Ill. Rev. Stat. 1969, ch. 53, par. 55.6). County clerks were also authorized to charge taxing districts 7

cents for each tax extension. (Ill. Rev. Stat. 1969, ch. 53, par. 35.) These arbitrary charges bore little or no relationship to the actual costs incurred in extending and collecting taxes on behalf of the taxing districts, and in many cases large sums of moneys were diverted from the local taxing bodies to the county treasury in the form of "excess" fees. (See *Board of Education v. Clark* (1972), 51 Ill. 2d 323.) The diversion of tax funds also created problems of constitutional dimensions as exemplified in *Flynn v. Kucharski* (1970), 45 Ill. 2d 211. In that case, this court held unconstitutional a statute which afforded taxpayers residing outside the City of Chicago the option of paying taxes levied by Cook County either to their township collector or to the county collector. If taxes were paid to the township collector, he retained a 2% commission which was placed in the township fund and used for local township purposes. Taxes levied for county-wide purposes were thus diverted to local township purposes in violation of the constitutional requirement of uniformity of taxation.

A review of the proceedings of the constitutional convention indicates little concern or discussion regarding the first two sentences of section 9(a) of article VII. The principal discussion and debate centered around the third sentence of section 9(a) providing that: "Fees shall not be based upon funds disbursed or collected, nor upon the levy or extension of taxes."

The Report of the Local Government Committee in its explanation of that sentence (7 Record of Proceedings, Sixth Illinois Constitutional Convention 1724-25; hereinafter cited as Proceedings) stated its concern with the township collector problem and concluded:

> "Both because of the constitutional cloud which has been cast upon the entire 'collection fees' system in Illinois by the *Flynn* case and because of the otherwise inherent inequities to the Illinois taxpayers arising out of this system, the Committee recommends the complete abolition of this 'collection fee' system and, indeed, recom-

mends a specific prohibition against the development of such a system in the future. For the same reasons, the Committee recommends that fees based upon the levy or extension of taxes should also be prohibited." 7 Proceedings 1724-25.

The debates upon the purpose of this third sentence of section 9(a) in our opinion clearly indicate the intent to preclude counties from seeking, in any form, reimbursement from the various taxing bodies for county services rendered in the collection of taxes. Illustrative thereof are the remarks of Delegate Zeglis who spoke to the Committee of the Whole on behalf of the Committee on Local Government regarding what is now section 9(a). He stated in part:

"But the controversial part [of section 9(a)] possibly will be, 'but fees shall not be based upon funds collected or the levy or extension of taxes.' The prohibition of any fees being charged upon funds collected or disbursed for the levy or extension of taxes will serve several purposes ***.

* * *

The elimination of fees for these services charged by the county clerk, collector, and treasurer to the units of local government is valid for the following reasons. One, it eliminates and simplifies the—it makes simple accounting. It's fairer to the public. A false impression is given that county government is operating efficiently on the taxes paid on the tax bills for county government; when, in fact, in most counties the county receives additionally 3 percent of every dollar levied by the county and villages and schools. The average citizen does not realize how large his county tax bill actually is.

I have a few examples here, that in one county of 100,000, that the people are under the impression that the county taxes—they run the county for $1,000,000, there is actually $400,000 in addition picked up by the county officials in excess of their expenses on this 3 percent skim-off. This 3 percent skim-off by the county of all local taxes gives the average citizen the false impression of the amount of actual tax receipts his city, junior college, village, school, park district, and fire district will be receiving. In practice, all administrators

take into account this loss, and in some counties the county clerk will increase the levy by 3 percent to cover this skim-off, if the local taxing body has not exceeded its statutory rate limit. Thus, taxes are raised under questionable circumstances.

However, the most valid reason for abolishing this skim-off by the county for its corporate fund is the inequitable nature of this hidden—what I call surtax. And at this point I really would like you to take a pencil and I will give you an example of why this is a surtax, which is very unfair. And we will use the proverbial $10,000 home. A homeowner in a rural area with a $10,000 home has a $300 tax bill. His taxes are low because he is taxed only by the county, his local school distrct, and the township. From his $300 taxes, 3 percent or $9 is taken by the county treasurer-collector as fees, and given to the county government for corporate purposes. In Kankakee County this runs to $400,000. For his $9 that this rural taxpayer pays—this $9—he receives very often a good county road, snow removal, police protection by the sheriff, the county zoning officer and building permits, the benefit of the county health department and many other services, and that is what he receives for his $9.

The other resident lives in a city in the county. His tax bill on his $10,000 house is $600, and the county treasurer takes $18 from his tax bill for county purposes. The reason his tax bill is $600 is because he pays his county tax, city tax, school and park district tax, airport authority tax, mosquito abatement tax, and the township and transit authority tax. Thus he indirectly pays the county $18 for county services, plus his ordinary county tax; and he receives none of the services that the rural resident receives, for the city provides his police protection, his road, zoning, building officers, and health officers. This would be an unfair tax without this example of discrepancy of services in these two areas as they—as why would a person with a high tax rate pay more county taxes than those in a low-tax area if the valuations are identical." 4 Proceedings 3404-05.

It is quite apparent from the discussions that the delegates to the convention realized that elimination of the compensation to counties for the tax collection services rendered other taxing bodies could well result in overall

tax increases, for counties would then be required to levy additional amounts to pay tax extension and collection costs while other taxing districts which formerly paid for those services would still be free to levy taxes up to their maximum limits.

Demonstrating this were the questions posed by Delegate Rigney (4 Proceedings 3405-06):

"MR. RIGNEY: Delegate Zeglis, did you have any testimony from county treasurers, or county clerks or board chairmen about this third sentence?

Do you have any idea how much you will have to increase your tax rate to compensate for what is going to be lost through the abolition of this tax skim-off?

MR. ZEGLIS: Yes, I do. I have tables on it. What county are you in.

\* \* \*

MR. RIGNEY: Well, like I say, I realize that this tax skim-off is not popular; but I think all of us, when we go back home to talk about this to the voters back home, we'd better be prepared to answer that question, because this is actually what we are doing is to double our county tax rate"

and Delegate A. Lennon, who was particularly concerned with the abolition of the township collector's fee (4 Proceedings 3406-07):

MR. A. LENNON: All right. So you now have superimposed upon everything else an additional levy by the township which would exceed the total tax bill presently, unless the other taxing districts decide—because of this windfall—to levy a lesser rate. Is that not true?

MR. ZEGLIS: That would be true.

MR. A. LENNON: And do you mean to tell me that the city of Joliet or the county of Will or the Joliet Park District is going to levy less than it's [sic] maximum rate in this day and age?

MR. ZEGLIS: No, but I also remind, Delegate Lennon, \*\*\*.

MR. A. LENNON: \*\*\*

So as I see it in Joliet—and you tell me if I am wrong—we would then have to pay a higher tax to support the same governmental units. Now we might or

might not get more services. I don't know. And contrary-wise, out in the county, it would be exactly the same thing; they would have to levy a higher township tax in order to get funds.

MR. ZEGLIS: Right.

MR. A. LENNON: The only thing I can see in voting for your proposition is that I am telling my people in the city, "We are going to start paying higher taxes," and out in the county the same thing. Now explain where I am wrong.

MR. ZEGLIS: Well, where you are wrong is that no money is going to get out of Will County. It is all going to be still in Will County, no matter how you look at it. Nobody is taking this away from Will County. It is just that we are making them account up for what—quit skimming off this 3 percent off your school district. Maybe this will make this article II on the elimination of townships a little more popular in Will County."

Subsequent discussion reinforces our conclusion as to the purpose of section 9(a). Delegate McCracken explained the reasons for formerly permitting the compensation which the Committee on Local Government rejected:

"MR. McCRACKEN: Without meaning to imply any conclusion, Delegate Zeglis, I would like to raise one additional factor that I don't think has been mentioned that is, perhaps, the most important factor in motivating the framers of the original procedure and perhaps might have some influence on the way the delegates look upon this question.

You really have to recognize that the county govern-ment, in its capacity of acting as a collector, is acting as a service organization for the other governments. Of course, in addition to that, the county government, as the other governments do, deals directly with the electorate. But if you stop to think about it, you really don't have comparable dichotomy in the case of any other govern-ment.

To approach it another way, suppose you were forming two brand new units of government, and, for economy's sake, you wanted to combine the real estate tax bills that the two would be sending out. One or the other or some third organization would have to be the

service organization to combine the two levies and send out one bill to each taxpayer.

Now the way our practice has developed, the county performs that function for the other governments. And your example about a hidden surcharge, or the effect of the procedure amounting to a hidden surcharge is true, is accurate, is well taken. But is that not really the result of a decision to accept the county's offer to service these other governmental bodies, and is it at all unreasonable for a person who is rendering a service to someone else to expect to collect a charge for it?

MR. ZEGLIS: I don't want you to lose the floor, but I thought I would answer that right now. That is true; but by levying a tax to cover the county treasurer's salaries, postage, all his office help, you are still charging everybody in the county with the service of the county treasurer.

And this way you are just charging—in your case, I think it would run about $15,000,000 a year skim-off—and I think the idea is that that makes the county treasurer feel he's pretty wealthy and can spend a lot of dough. See?

MR. McCRACKEN: Well, really, your point has to do with his method of accounting. If he were to impute that income and show it in his budget, then you wouldn't have that accounting objection.

I want to make a specific point—I've made my general point—specifically, you can have a difference in degree of difficulty of collection. It could well be that in one school district you have large taxpayers—taxpayers who readily pay—and in another school district you have many small taxpayers with a lot of real estate transfers and a lot of confusion in the warrant books.

MR. ZEGLIS: Right.

MR. McCRACKEN: Now, actually, shouldn't each of these governments be paying what it is costing the county to service them, rather than each citizen in the county?

MR. ZEGLIS: Well, you see that is the reason for that seven-cent extension charge for each extension. If you live in a different—well, you know the—

MR. McCRACKEN: Precisely; and aren't you suggesting that we do away with that?

MR. ZEGLIS: Yes, but your point is very well taken. ***." 4 Proceedings 3407-08.

Thereafter an effort was made to amend the section by deleting therefrom the language which is now the third sentence of section 9(a) and the focal point of this litigation. In the course of the debate upon that proposed amendment it became quite clear that its purpose was to permit a continuation of the system of compensating townships and counties for tax extension and collection services, and that the section as proposed by the Committee was intended to eliminate that compensation. Illustrating this, Delegate Rigney, speaking in support of the proposed amendment concluded:

> "So I just point some of these things out to you. If you think this is a money-making deal for the county, believe me, it most certainly is not. I think it is a very fair way of raising the needed revenues to support this most vital service to our counties." (4 Proceedings 3414.)

Delegate Zeglis was asked whether he wished to respond on behalf of the Committee. He did so, stating in part:

> "MR. ZEGLIS: Yes, I would like to. First, I would like to explain that when you take this 3 percent off of your school districts' and your city's levy and give it to the county corporate fund, you are really not—you are really making a tax, a surtax; and it is my opinion that when the county wants to raise money or a township, that they should levy a tax like everybody else and not have this little hidden tax." (4 Proceedings 3415.)

The proposed amendment was defeated.

It is true, as defendants argue, that section 21a of "An Act concerning fees and salaries ***" eliminates some objectionable aspects of the collection fee system. The difficulty, however, is that it simply is not compatible with the intent of section 9(a) to eliminate the practice of counties charging local taxing districts for tax collection services, and it is in that sense that the term "fee" was utilized, not, as defendants urge, solely in the limited sense of prohibiting an arbitrary percentage or fixed charge. This

meaning, it seems to us, is demonstrated by the fact that the phrase "fees shall not be based upon" appearing in section 9(a) is used interchangeably with the term "fees shall not be charged for" in the debates, committee proposals and official explanation. The report of the Committee on Local Government to the Committee of the Whole with respect to section 9(a) contains the following explanation: "The last portion of the third sentence prohibits fees 'based upon funds collected or disbursed'. This language prohibits, most importantly, the system under which township collectors *charged a fee for* the collection of taxes. \*\*\* This portion of the last sentence also extends its prohibition *to fees charged for* 'the levy or extension of taxes'." (Emphasis added.) (7 Proceedings 1717-18.) The official explanation of section 9(a) reads as follows: "This changes Article X, sections 9, 10, 11, 12 and 13, of the 1870 Constitution. This section places local officials on a salaried basis and eliminates fee officers. *It also would end the practice of charging fees for the collection of taxes.*" (Emphasis added.) 7 Proceedings 2730.

The defendants also argue that to prohibit counties from recovering the costs of tax collection from the local taxing bodies would violate the constitutional requirements of uniformity of taxation and equal protection of the law under the rationale of the *Flynn* case. They contend that to require all taxpayers within a county to bear the burden of the cost of tax collection services creates an inequality among taxpayers in that those who pay taxes to more taxing bodies get more service from the county treasurer than those taxpayers who pay taxes to fewer taxing bodies. This argument is without merit. The *Flynn* case was concerned with a significantly different situation involving a choice given to some, but not all, taxpayers within a given county to pay their taxes in such a manner that taxes levied for countywide purposes were diverted to local township purposes. The constitutional

provision in the case before us, on the other hand, reflects a determination by the framers of the Constitution that the collection of taxes by county officers is a county function which should be supported by county taxes. Unlike *Flynn,* there is no diversion of tax monies nor any lack of uniformity of taxation. Perfect equality is neither a constitutionally required nor a realistic goal, and the possibility that some taxpayers or some taxing districts in the county may receive more tax collection service from county officials, is not, in our opinion, a viable objection. *Schreiber v. County of Cook* (1944), 388 Ill. 297, 303.

The defendants also suggest that prohibiting the county from recovering the costs of tax collection from the local taxing bodies is contrary to the letter and spirit of section 10 of article VII of the 1970 State Constitution providing for intergovernmental cooperation. With this contention we cannot agree. By law the county treasurer is required to act as *ex officio* collector for local taxing units. (Ill. Rev. Stat., 1970 Supp., ch. 120, par. 657.) Neither counties nor local taxing bodies have any choice in the matter, and the question of the ability of the two units of local government to contract among themselves, to obtain or share services, or to exercise, combine or transfer powers and functions as to the matter of tax collection does not arise. Section 9(a) of article VII is, of course, limited in scope to the particular functions specified therein, and does not purport in any way to limit or restrict counties and local taxing districts from contracting among themselves as to other matters.

Accordingly, the judgments of the circuit courts of Will and Peoria Counties declaring section 21a of "An Act concerning fees and salaries ***" invalid as contrary to the provisions of section 9(a) of article VII of the 1970 Constitution of Illinois are affirmed.

*Judgments affirmed.*